McKinney, J.,
delivered the opinion of the Court.
The prisoners were jointly indicted in the Circuit Court of Campbell, for the killing of S. D. Queener and Travis Gibson. *142 And at the July Term of the Circuit Court of Anderson — to which the venue was changed — they were jointly tried and convicted of murder in the first degree. The jury in their verdict expressed their opinion, that there were mitigating circumstances in the case; but the Court disregarded this expression of opinion, and pronounced judgment of death upon the prisoners; from which judgment they jointly appealed in error to this Court.
It is insisted that various errors exist in the proceedings and judgment, the more important of which will be considered.
1st. After the full number of jurors had been selected and placed in the jury-box, but before they were sworn, the Attorney General moved the Court to reject William D. Landrum, one of the twelve jurors, on the ground of his improper conduct, in the presence of the Court, after being chosen as a juror. It was fully proved, by the testimony of five members of the bar, — and the matter had, in part, attracted the attention of the Court, — that after Landrum (who was the first juror chosen by the prisoners) had taken his seat, he placed himself in such a position as that he could command the eye of one Warrick, the brother-in-law of the prisoners, who was seated in the bar by the counsel of the prisoners; and that during the progress of the selection of the other jurors, Lan-drum busied himself in indicating to Warrick, by motions of the head, and other significant modes, who to accept and to reject as jurors, as they were respectively put to the prisoners.
Upon this ground, the Court ordered that the name of Lan-drum be struck from the panel, and that he be discharged as a juror.
In making up the jury, the Attorney General had exhausted ■ the challenges of the State; but there remained to the prisoners six peremptory challenges. And for the selection of another juror in the place of Landrum, the Court directed an additional list of seven jurors to be furnished, which was done. The prisoners exhausted their six challenges without choosing a juror; and, thereupon, one Partwood, who was tried and *143 found qualified, was ordered by tbe Court to take bis seat as a juror, in the stead of Landrum.
In this proceeding there is no error. The discretionary power of the Court to reject a juror, before being sworn, even in a capital case, for sufficient cause, cannot at this day be questioned. Nor can it admit of doubt, that the discretion Avas properly exercised in this instance. It would be a ridiculous mockery of justice to permit such an unfit person to act as a juror. All that can be justly said against the action of the Court is, that it did not go far enough. Such unabashed effrontery and corruption, acted out in the presence of the Court, should have been made an example of by the Court
The position, that, upon the rejection of Landrum, the prisoners were entitled to a full panel of jurors, is wholly untenable. By the action of the Court, in rejecting the juror, they had lost no challenge; and the additional list of seven jurors, was all they had a right to demand.
2d. The murder was committed in the attempt to arrest the prisoners, for the alleged crime of passing a counterfeit bank note, to one Sharp. The persons slain were the sheriff of Campbell county and his deputy, who accompanied him as an assistant. The supposed felony Avas not committed in the presence of the officers ; and in attempting to make the arrest, they acted without a warrant, and merely upon the charge made against the prisoners by Sharp.
The proof shows, that the killing took place on the third day of August, 1858. It appears that the prisoners staid at the house of Sharp, some five miles east of Jacksboro’, the night preceding the murder. In the morning, Jesse Lewis handed to Sharp a tAventy dollar bank note, purporting to be on the Bank of Hamburg, South Carolina, (which was believed to be a counterfeit note,) out of AA7hich to take their bill of $1.25, and said that was the “least money he had.” Sharp returned him the note, saying that he could not change it, but that he would go with them to Jacksboro’ and get it changed for them; and, accordingly, started with them. On the way to town, the conduct of the prisoners was suspicious. They *144 sometimes fell behind, and at other times rode before Sharp, conversing with each other in a low tone of voice. On reaching town, Sharp rode up to the house of one Gary, to consult with him in relation to the matter, and the prisoner, Jesse, followed him, and “ said it was not worth while to go farther, that they had the change,” and handed him the dollar and twenty-five cents. The prisoners then inquired where they could get liquor, and where they could get a horse shod. They were pointed to a grocery and blacksmith shop at the upper end of town, and they started in that direction.
Steps were instantly taken, by Sharp and some others, to procure a warrant for the arrest of the prisoners, for passing said counterfeit note. The Justice, however, declined to issue a warrant, for the reason that the Christian names of the prisoners were not known. By this time it was discovered that the prisoner’s had not gone to the grocery or blacksmith shop; but, without stopping at all, had taken the road leading to Scott county, which crosses Cumberland mountain a short distance north of Jacksboro’, riding at a pretty rapid gait. Queener and Gibson happened to be in town, and they were informed of all the facts, and were urged to pursue and arrest the prisoners. They accordingly set out in the pursuit, some twenty minutes or more after the prisoners left town, and overtook them on the mountain, some three miles from Jacksboro’. Queener and Gibson were both unarmed. All that is known of the circumstances of the attempted arrest, and the terrible tragedy that ensued, is gathered from the dying declarations of Queener, who lived for several hours after the mortal wound inflicted upon him by the prisoner, Jesse. Gibson died instantly.
The substance of Queener’s statement is, that on overtaking the prisoners, he laid his hand on the shoulder of one of them, (Jesse,) and said to him, “ I take you as a State’s prisoner,” and he had hardly got the words out, when the prisoner placed a pistol against his breast, and snapped it, and instantly shot again, as he, Queener, was in the act of getting off his horse, the ball taking fatal effect in his left breast. After *145 being shot, however, he saw Gribson engaged with the other prisoner, some short distance below the road, and went to help him, and the prisoner, Jesse, followed after, and commenced “ cutting that was the last he knew of Gribson. The proof shows that Gribson was fatally stabbed and cut in the neck; and Queener was also cut on the head, breast, and shoulders, in addition to the pistol wound.
It also appears from the proof, that about a month after the murder, a person passing near the place of the rencounter, found a parcel of counterfeit bank notes, amounting, in all, to $175. These notes, and the facts connected with their finding, were admitted in evidence to the jury. The witness, Sharp, was also permitted to state, that, from appearances, he-was of opinion that one of said notes was the note passed to him. To the admission of all this evidence respecting said notes, exception was taken.
The Court, also, admitted evidence of previous acts of pass^ ing counterfeit notes, by the prisoners, or one of them, at dif^ ferent times, more or less remote from the act of passing the note to Sharp, and purporting to be on various banks, without the notes being produced, or their loss accounted for, or notice to the prisoners to produce them. This evidence was, also, excepted to.
Upon the foregoing facts, several questions are raised. It is insisted that the attempted arrest of the prisoners was unauthorized and illegal; first, upon the ground that there was no sufficient evidence that any criminal offence had been committed ; and, therefore, a homicide committed in resisting such arrest, could not be murder in the first degree.
This position assumes that the fact was not established, that the note passed to Sharp was really a counterfeit note. And this seems to have been regarded on all hands, in the Court below, as the main point in the case.
If the fact were to be admitted, that the note passed to Sharp was not shown to have been a counterfeit, and consequently, that no felony was committed, it would by no means follow that the arrest was unauthorized or illegal. Whatever *146 doubt may have formerly existed on the subject, we understand the law to be now well settled, that a peace officer may make an arrest on a charge of felony, upon a reasonable cause of suspicion, without a warrant, although it should afterwards turn out that no felony had, in fact, been committed. 1 Russell on Crimes, (Am. Ed. of 1853,) 595, 596, 597; Wharton’s Law of Homicide, ch. 5, p. 54. And this principle of the common law is distinctly incorporated in our Code, sec. 5037.
Such being the rule of law, there can be no doubt as to the authority of Queener and Gibson, upon the information communicated to them, to arrest the prisoners. The facts upon which they acted, in our opinion, furnished “ a reasonable cause of suspicion ” that a felony had been committed ; and this was sufficient for their justification; they haying acted in good faith, upon that belief, as the proof sufficiently establishes.
In this view, the evidence adduced to show that the note passed to Sharp was not a genuine note, and all the collateral circumstantial evidence offered — of the finding of counterfeit notes at the place of the homicide; and of previous acts of passing counterfeit notes by the prisoners — for the purpose of showing a guilty knowledge, and that a felony had, in fact, been committed by the prisoners, was unimportant; and may, therefore, be dismissed from our consideration of the case, together with the numerous and somewhat vexatious questions raised upon it, without any expression of opinion thereon.
It is insisted, secondly, that the arrest was illegal because the officer did not inform the prisoners of his authority, and the cause of the arrest, as is supposed to have been necessary by section 5038 of the Code.
This conclusion is not tenable for two reasons — the one of fact, ■the other of law. First: the extreme suddenness and ferocity .of the murderous assault made upon the officer, denied him the opportunity of giving this information, if it had been requisite, under the circumstances, to have done so. But, in ■ the second place, the law did not require that the officer should inform the prisoner of his authority, and the cause of the ar-xest, in a case like the present. The principle is settled, that, *147 where a person is taken in the commission of an offence, or upon fresh pursuit afterwards, notice is not necessary; because, in either case, he must be supposed to know the cause of his arrest. 1 Russell on Crimes, 623; Wharton’s American Law of Homicide, 60. And the exception in the Code, (sec. 5038,) in accordance with the common law, expressly dispenses with such notice, where the person “ is in the actual commission of the offence, or is pursued immediately after the escape.”
But it is argued that the common law principle is changed, by force of the word “ escape,” used in the Code. This is not so. The term “ escape ” is not to be taken in its technical sense, which would imply, as is argued, that the person was previously in custody of the officer, and had eluded his vigilance. It must be understood in its popular sense, which is, “to flee from, to avoid, to get out of the way,” &c. This is placed beyond doubt, when we refer to section 5043 — which provides for an arrest by a private person — in which, instead of the words, “is pursued immediately after an escape,” the language used is, “ or when arrested on pursuit.”
3d. Exceptions are taken to the instructions of the Court. The only part of the charge which we consider necessary to notice, is the following : Upon the return of the jury for further instructions, “ the Court charged, that no time was required by the law, for the deliberation and premeditation necessary to constitute murder in the first degree, so that the purpose and intent to kill, accompany the act.”
This statement is supposed to be equivalent to saying, that no intervening time is required between the formation of the purpose to kill, and its execution. Such is not the fair construction of the charge. This would be absurd; for, the volition, or mental act of forming the purpose to kill, must, of necessity, precede the physical act by which the death is caused; but yet, the latter act may succeed the former so quickly, that there may be scarcely an appreciable pause, or intermission, between.
I The distinctive characteristic of murder in the first degree, *148 is premeditation. This element is superadded, bj the statute, to the common law definition of murder. Premeditation involves a previously formed design, or actual intention to kill. But such design, or intention, may be conceived, and deliberately formed, in an instant. It is not necessary that it should have been conceived, or have pre-existed in the mind, any definite period of time anterior to its execution. It is sufficient that it preceded the assault, however short the interval. The length of time is not of the essence of this constituent of the offence. The purpose to kill is no less premeditated, in the legal sense of the term, if it were deliberately formed but a moment preceding the act by which the death is produced, than if it had been formed an hour before. The mental state of the assailant at the moment, rather than the length of time the act may have been premeditated, is the material point to be considered. The mental process, in the formation of the purpose to kill, may have been instantaneous; and the question of vital importance is — was the mind, at that moment, so far free from the influence of excitement, or passion, as to be capable of reflecting and acting with a sufficient degree of coolness and deliberation of purpose; and was the death of the person assaulted, the object sought to be accomplished — the end determined upom) Dale v. The State, 10 Yer., 551 Swan v. The State, 4 Hum., 136; Bishop on Cr. L. secs. 628, 658, and cases referred to.
In this view of the law, that part of the charge excepted to is subject to but little criticism. All that can be said is, that the general expression, “no time,” should have been qualified by adding, no definite time. But no prejudice or misapprehension could have resulted from this omission; for the principle had been twice fully and correctly stated in the preceding part of the charge.
4th. It is insisted that the Court erred in disregarding the finding of the jury, that there were mitigating circumstances in the case.
This has been, to us, the point of greatest difficulty in the case. It is argued, that the provision of the Code, (sec. *149 5257,) should be held, in favor of life, to he imperative on the ■Court to commute the punishment; and not merely as conferring a discretionary power, that may or may not he exercised, as the Court may deem proper and just in view of the circumstances of each particular case.
The substance of the provision is, that in cases of conviction of a eapital offence — where the jury in their verdict state that they are of opinion that there are mitigating circumstances in the case — “ the Court may ” commute the punishment from death to imprisonment for life in the penitentiary. This section of the Code is an almost literal re-enactment of one of the provisions of the act of 1838, eh. 29, with this important modification, that, by that act, it is expressly declared, that “it shall be the duty of the Court” to commute the punishment.
It is trae that the word “ may ” is sometimes held to have the same sense, or to mean the same thing, as the word “shall,” and it will be so interpreted whenever the obvious reason or intention of a statute requires that it should be so understood. The general rule, however, is, that the words of a. statute are to be taken in their natural and ordinary signification and import. 1 Kent’s Com., 462.
Is there, then, any ground on which it can be supposed that the framers of the Code intended that the word “ may,” in the connection in which it is used in the section under consideration. should he understood in a sense different from its ordinary signification ? We think not.
It will be observed, that the law on the subject of the commutation of punishment is materially changed by the Code, both as respects the executive and judicial departments of the government, as will be seen by comparing its several provisions with the statutes previously in force. The power vested in the Governor, by the Code, to grant “ commutations,’’ is an unqualified and discretionary power, different from that formerly possessed. So the power given to the Courts to com. mute the punishment in cases of petit larceny, is, in express terms, a discretionary power — without the recommendation of the jury, as was formerly required. It is manifest that the au *150 thors of the Oode, in revising the act of 1838, contemplated a change of the law. This is demonstrable from their dropping the imperative words of that act, and substituting language of a different import and signification. This conclusion is placed beyond doubt, by reference to sec. 41 of the Oode, by which it is provided, among other things, that all public and general acts, passed prior to the session of the General Assembly of 1857-8, are repealed; consequently, the act of 1838, ch. 29, is repealed; and the only rule for our government, upon this subject, is that prescribed in sec. 5257 of the Code.
We are of opinion, therefore, that the object and intention of this section was to change the rule, by which the opinion of the jury was made obligatory on the Court; and to leave it in the sound discretion of the Court, upon an unbiassed and discriminating survey of the whole case, to give effect to the opinion of the jury, or to refuse to do so, as the ends of public justice might seem to dictate. And in view of the responsibility resting upon us, we cannot forbear to say, that, in our judgment, it was a wise and salutary change of the law, demanded by the highest considerations of public policy, and, regard for the lives of the community. Experience has fully shown, that such a discretion intrusted absolutely to juries, is subject to abuse ; and that its exercise is sometimes so indiscriminate and improper, as to defeat, in some degree, the objects of criminal punishment. The present case is an illustration of the fact, that such an expression of opinion by the jury is only to be accounted for, in some instances, on the supposition of undue influence, or a false sympathy, or as a compromise.
As respects the sufficiency of the proof to support the conviction,'there can be no reasonable doubt. From all the facts of the case, the conviction is forced upon the mind, that the prisoners had set out upon a course of crime, with the deliberate and desperate determination not to suffer themselves to be brought to justice; and that in pursuance of this resolution, the cruel and unmitigated murder of which they have been convicted, was committed.
There is no error in the judgment, and it will be affirmed.